# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ANGELO ARREOLA, | 1:10-CV-00739 GSA HC |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT |
| A. HEDGPETH, Warden, | ORDER DECLINING ISSUANCE OF CERTIFICATE OF APPEALABILITY |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The parties have consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c).

## BACKGROUND[1]

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kings, following his conviction by jury trial on September 26, 2007, of first degree murder. On November 9, 2007, he was sentenced to serve an indeterminate term of 25 years to life in state prison.

Petitioner filed a timely notice of appeal. On January 27, 2009, the California Court of

---

[1] This information is derived from the petition and the answer and is not subject to dispute.

Appeal, Fifth Appellate District ("Fifth DCA"), affirmed Petitioner's judgment in a reasoned decision. Petitioner then filed a petition for review in the California Supreme Court. The petition was summarily denied on April 22, 2009.

On April 28, 2010, Petitioner filed the instant federal habeas petition. He presents the following claims for relief: 1) The trial court violated Petitioner's constitutional rights by precluding relevant, admissible reputation evidence that a key prosecution witness was a liar and a thief; 2) The trial court violated Petitioner's constitutional rights when it allowed the admission of irrelevant, inflammatory evidence of telephone conversations in which Petitioner used profanity, referenced mental health issues, promised not to fight in jail, and implied he was affiliated with a gang; 3) The trial court prejudicially erred by failing to instruct on the lesser-included offense of voluntary manslaughter based on imperfect self-defense; and 4) The trial court prejudicially erred when it refused a defense instruction on motive.

On October 27, 2010, Respondent filed an answer to the petition. Petitioner did not file a traverse.

## STATEMENT OF FACTS[2]

Steven Gonzales was murdered in the early morning hours of February 15, 2007. (RT[3] 202.) Ashley Martinez was Steven Gonzales' former girlfriend. (RT 351.) They had two children together. (RT 351.) At the time of Steven's murder, Ashley and Steven were only friends. (RT 351, 353.) Beginning in November or December of 2006, Ashley began dating Petitioner. (RT 354.) She lived with Petitioner at his residence. (RT 356.) Steven and Petitioner had an understanding that Steven would come around Ashley and their children for the sake of the children. (RT 355.)

Michael Velasco was a friend of Steven Gonzales. (RT 321-322.) On the night Steven Gonzales was murdered, Michael last saw him heading toward Joel Espinoza's home. (RT 328-329.) In an interview with Deputy Sheriff Thomas Wilcox, Michael stated Steven told him he

---

[2] There is no separate statement of facts set forth in any of the state court decisions.

[3] "RT" refers to the Reporter's Transcript on Appeal.

1  was going to Joel's home. (RT 478.)

2  Destiny Sandoval lived at Joel's home.  On February 15, 2007, Destiny Sandoval woke up in the middle of the night. (RT 202.)  She got up and went to return her phone to the phone charger. (RT 202.) As she was doing so, she ran into her brother Joel Sandoval. (RT 204.)  He told her that he had just gotten into a fight with "some guy." (RT 204-205.)  Destiny then heard what sounded like someone being shoved into the exterior garage door. (RT 205.) Moments later she heard the whistling sound of a baseball bat being swung and the sound of a bat hitting something. (RT 205-206.)  Joel immediately opened the door leading to the garage and Destiny saw Petitioner standing over the victim while holding a baseball bat. (RT 206.) Petitioner looked at them with the bat in his hand and said, "That fool rushed me." (RT 210.) Destiny described Petitioner as having an "evil look on his face." (RT 211.) Destiny could hear the victim making gurgling sounds as if he was struggling to breathe. (RT 210.) Destiny backed away from the garage door and Petitioner entered the house.  He told her, "Tell your mom I'm sorry, I didn't choose the place or the time, whatever happens, happens in the past." (RT 211.)  She immediately went to her room and locked the door. (RT 211.)  Later, after Petitioner had been arrested, Destiny went to the police and provided this information. (RT 214.)

In an interview with Clovis Police Officer Jaime Ramirez, Ashley Martinez stated that on the night of the 14th leading into the morning of the 15th, Petitioner was not home with her. (RT 524.)  She told Officer Ramirez that she believed Petitioner was at Joel Espinoza's house. (RT 524.)  She stated that Petitioner did not return home until five or six o'clock in the morning. (RT 524.)  When Petitioner did return home, his aunt Jessica Modesto and Ashley were at the home. Jessica Modesto testified that when Petitioner returned home, he had a "scary look on his face." (RT 760.)  He immediately came up to Jessica and stated, "We just killed Ashley's baby daddy." (RT 761-765.)  He told Jessica that they killed the victim because he had been talking to the police about Petitioner. (RT 765-766.) Jessica then left. (RT 766.)

Ashley also saw Petitioner enter the residence that morning.  She stated that Petitioner was acting strange and pacing back and forth in the apartment. (RT 526.)  She did not talk with Petitioner, but she heard Petitioner whispering with Jessica in another room. (RT 526.) Petitioner

3

left shortly thereafter and Ashley asked Jessica what Petitioner had said, to which Jessica replied, "You don't even want to know. I can't believe [Petitioner] did this." (RT 526-527.)

A couple of days later, Jessica returned to the house to get her clothes. (RT 776-777.) She made contact with Joel Espinoza. (RT 777.) Jessica told Joel, "Please tell me you didn't have nothing to do with Steven." (RT 778.) Joel stated, "I had to do it." (RT 778-779, 781.) Jessica asked him why, and Joel stated it was because the victim had been talking to the police. (RT 779.) Jessica asked him where the body was and Joel replied that it was in his garage. (RT 779.) Joel also told her that his mother had witnessed the incident. (RT 779-780.) At that point, Petitioner arrived at the home. (RT 780.) Joel asked for a ride to his home, and Jessica drove him there. (RT 780.) Jessica also spoke with Petitioner. (RT 771.) Petitioner stated to Jessica, "Fuck, Tia, I still can't get rid of the body." (RT 771.) A few days later, Jessica gave Joel a ride to the Dollar Tree store so Joel could pick up his mother's blue pickup truck. (RT 783-784.) Jessica subsequently contacted her parole officer and asked that she be placed in another home. (RT 773.)

Steven's body was found in an orchard in Kings County. (RT 390.) The body was wrapped in carpeting and tied in knots with white extension cord and green extension cord. (RT 404.) It had been set on fire. (RT 390.) A bloodstained piece of plywood painted with a peach and/or pink color was found underneath the body. (RT 409.) A cigarette butt was located in the wrappings around the victim. (RT 416.) Shoe patterns matching the K-Swiss brand of shoe were located near the body. (RT 423-424.) Shoes belonging to Joel Espinoza were recovered from a garbage receptacle outside Joel's house. (RT 424-426.) They were of the K-Swiss brand, covered in blood, and matching the shoe tread patterns at the murder scene. (RT 424-426.) A tire track was also found at the murder scene. (RT 429.) It matched the tire tread of a blue truck normally driven by Joel's mother. (RT 430.) Plywood matching that found under the victim's body was found in the bed of the truck. (RT 436.)

A search warrant was executed at Joel's house. (RT 440.) Pieces of the same green extension cord used to tie up the body were discovered at the house. (RT 440, 455.) Officers located various blood spots and stains inside the garage of the residence. (RT 440-441.) Bloody

1  clothing and a sawed-off shotgun were recovered. (RT 441.) Bedding sheets and towels of the
2  same brand, type, color, and pattern as those used to wrap the victim's body were located in the
3  residence. (RT 441.) Pieces of the same plywood found under the victim were also located in the
4  alley behind the residence. (RT 447.) Blood was also found on and underneath a gray pickup
5  truck in the garage. (RT 451.) A criminalist testified that blood evidence taken from the garage
6  was in all probability[4] from the victim. (RT 648.) The criminalist also testified that the cigarette
7  butt located with the victim's body contained DNA matching Joel Espinoza. (RT 652.)

8        A pathologist testified that the victim died as a result of blunt force trauma to the head
9  and neck. (RT 679-688.) The blunt force applied to the victim would have been consistent with
10 impact by, *inter alia*, a two-by-four, a baseball bat, and stomping and kicking by foot. (RT 680-
11 681, 687-688.) When Petitioner was arrested, he had a broken middle toe. (RT 551.) The victim
12 also had a high level of methamphetamine in his body at the time of death. (RT 693.) The
13 pathologist stated the high level could have been due to the drug having been administered to the
14 victim by another prior to death. (RT 698.)

**DISCUSSION**

I.    Jurisdiction

17       Relief by way of a petition for writ of habeas corpus extends to a person in custody
18 pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws
19 or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,
20 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered violations of his rights as
21 guaranteed by the U.S. Constitution. He was convicted in Kings County Superior Court, which
22 is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

23       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act
24 of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its
25 enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114
26 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

---

[4]The criminalist testified that the probability that another randomly selected Hispanic individual could match the blood profile was 1 in 39 billion; there are only an estimated 6 to 7 billion people in the world. (RT 648.)

5

Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

## II.    Standard of Review

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, a petitioner can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412; see also Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 785 (2011). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer, 538 U.S. at 71.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting*, 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S.

at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Harrington, 131 S.Ct. at 785. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Williams, 529 U.S. at 409. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington, 131 S.Ct. at 786, *quoting*, Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Further, "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. __, __, 129 S.Ct. 1411, 1413-14 (2009). "Under 2254(d), a habeas court must determine what arguments or theories supported or, . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding of a prior decision of [the Supreme] Court." Harrington, 131 S.Ct. at 786. Only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents" may the writ issue. Id.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. "Factual

determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

III.   Review of Claims

    A.  Exclusion of Reputation Evidence

Petitioner first alleges the trial court erred in excluding relevant, admissible reputation evidence, specifically, evidence that Jessica Modesto, the key prosecution witness, was a "liar and a thief." (See Petition at 16.)

This claim was presented on direct appeal to the Fifth DCA where it was rejected in a reasoned opinion.  It was then presented in a petition for review in the California Supreme Court.  The petition was summarily denied on April 22, 2009.   When the California Supreme Court's opinion is summary in nature, the Court must "look through" that decision to the court below that has issued a reasoned opinion.  Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991).  The appellate court denied the claim as follows:

> Arreola argues that prejudicial error arose from the trial court's exclusion of reputation evidence that key prosecution witness Jessica Modesto was a liar and a thief. The Attorney General agrees that exclusion of that evidence was error but argues that the error was harmless.
>
> The evidentiary issue here arose during defense direct examination of Arreola's cousin Priscilla Villa about Modesto, his aunt:
>
> "Q. What is the reputation of Ms. Modesto within the families?
>
> "A. Within the family I just heard that she lies and steal [sic] a lot.
>
> "[PROSECUTOR]: Objection, hearsay. She's just hearing, she doesn't know what the reputation is.
>
> "THE COURT: Sustained.
>
> "[DEFENSE ATTORNEY]: That's how you know reputation.

8

"THE COURT: The jury will disregard the response."

Evidence Code section 1324 codifies "a well-settled exception to the hearsay rule" by which "reputation evidence as to character or a trait of character" is admissible under the rule.[FN3] (7 Cal. Law Revision Com. Rep. (1965) p. 1.) Evidence Code section 1100 generally allows "any otherwise admissible evidence (including evidence in the form of an opinion, evidence of reputation, and evidence of specific instances of such person's conduct)" as character evidence.[FN4] Although Evidence Code section 1101 generally prohibits character evidence to prove conduct on a specific occasion, Evidence Code section 1103, subdivision (a) states an exception to the rule specifically to allow in criminal cases character evidence "in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct" to prove a victim's conduct in conformity with his or her character.[FN5] On the state of the law and the record, we agree with Arreola and the Attorney General that the trial court's ruling was erroneous. So we turn to the record on the issue of prejudice.

FN3. Evidence Code section 1324: "Evidence of a person's general reputation with reference to his character or a trait of his character at a relevant time in the community in which he then resided or in a group with which he then habitually associated is not made inadmissible by the hearsay rule."

FN4. Evidence Code section 1100: "Except as otherwise provided by statute, any otherwise admissible evidence (including evidence in the form of an opinion, evidence of reputation, and evidence of specific instances of such persons conduct) is admissible to prove a persons character or a trait of his character."

FN5. Evidence Code section 1101 states the general rule that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid.Code, § 1101, subd. (a).) Evidence Code section 1103, subd. (a)(1) states an exception to the general rule: "(a) In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: [ ] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character."

Modesto testified Arreola told her that Gonzales was killed because he was talking to the police and that "*they* couldn't get rid of the body," but she admitted on the stand to having said to officers that Arreola told her, " *I* still can't get rid of the body," yet she still testified that she was "pretty sure it was *we* or *they*." (Italics added.) Modesto testified Espinoza told her that he was involved with Gonzales's death because Gonzales had talked to the police, that he told her, "I had to do it," that he told her Gonzales's body was in his garage, and that he admitted he "couldn't get rid of the body."

Modesto testified Arreola told her with a scary look on his face, "*We* just killed Ashley's baby daddy," or, "*They* just killed Ashley's baby daddy," referring to Gonzales as the father of Martinez's children. (Italics added.) She claimed she was not focusing on those words because she had just awakened under the influence of methamphetamine and Vicodin. "I didn't get to hear exactly the *we, they,* but I did hear, 'killed Ashley's baby daddy,'" she insisted. (Italics added.)

However, in reply to the question on cross-examination, "You switched the words a little bit to get him in trouble, isn't it true?," Modesto admitted, "I mean, I was hurt with him, yes." She acknowledged that she was upset with him for cursing, disgracing, and

9

threatening her, even though she admitted keeping longer than she should have the hair straightener she borrowed from Martinez, and that she was angry with and hurt by him for refusing to lend her money, especially after she found out he had loaned money to someone else.

"And isn't it true, ma'am," Modesto was asked, "that you were gonna get him back for all the disrespectful thing [*sic*] he did against you, you wanna pay back?" She replied, "Well, I wasn't planning it this way, but." To the question, "But you wanted to pay back at some point with something?," she admitted, "Yes. I was very hurt with him." "You were very hurt?," she was asked. "Yes," she replied. "And angry?," she was asked. "Yes," she replied.

Additionally, Modesto admitted that she was a two-striker "for persuading a witness or something like that," that she was still on parole after serving time in prison for multiple counts of conspiracy to defraud the state, and that she had numerous parole violations for drug use. Congruently, Villa impugned Modesto's reputation for honesty from her familial perspective as her cousin. With no objection, she testified Modesto told her that "even though it's family" she could bring Arreola down even if she had to make up lies and that "she'll do what she has to do to get somebody back."

Likewise, Lacey Lara impugned Modesto's reputation for honesty from her familial perspective as her niece. Lara testified that since Modesto was living at Lara's house and babysitting Lara's daughter on the night of the killing there was no way she could have heard Arreola say anything that night about the killing of "Ashley's baby daddy." Lara also testified that Modesto took, and never returned, Lara's $300 cell phone when she moved out of Lara's house.

The record shows that the scrap of evidence at issue here-"Within the family I just heard that she lies and steal [*sic*] a lot"-was entirely cumulative since Modesto's own testimony, together with that of her cousin Villa and her niece Lara, abundantly impeached her as a liar and a thief. By the federal standard of review, the trial court's erroneous ruling was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (*Chapman*); U.S. Const., 6th & 14th Amends .) By the state standard of review, a verdict more favorable to Arreola was not reasonably probable in the absence of that error. (*People v. Watson* (1956) 46 Cal.2d 818, 836, 299 P.2d 243 (*Watson*); Cal. Const., art. VI, § 13.)

(See Petition, Ex. A.)

Generally, the admissibility of evidence is a matter of state law and is not reviewable in a federal habeas corpus proceeding. Estelle v. McGuire, 502 U.S. 62, 68 (1991); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985). Nevertheless, a constitutional violation meriting habeas relief may occur where a criminal defendant is denied "a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690 (1986), *quoting*, California v. Trombetta, 467 U.S. 479, 485 (1984).

In this case, it is abundantly clear that Petitioner was not denied the opportunity to present a complete defense. The reputation evidence at issue, that Jessica Modesto was considered a liar

and a thief among her family, was elicited by Petitioner from other witnesses as well as from Jessica Modesto herself. (RT 824-916.) In addition, Petitioner was able to impeach Modesto's credibility on the basis of her fraudulent criminal background, her numerous parole violations for drug use, and her admitted motivation to lie and incriminate Petitioner. As stated by the appellate court, the "scrap of evidence at issue here" was entirely cumulative of the evidence presented by the defense. (See Petition, Ex. A at 8.)

Even if the exclusion of this reputation evidence rose to the level of a constitutional violation, it did not have a "substantial and injurious effect" on the verdict. Fry v. Pliler, 551 U.S. 112, 121-22 (2007); Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). As already discussed, the evidence was cumulative. Substantial evidence impugning Jessica Modesto's credibility was presented. Accordingly, the claim must be rejected.

### B.   Admission of Irrelevant, Inflamatory Evidence

In his next claim for relief, Petitioner contends his due process rights were violated by the trial courts erroneous admission of telephone conversations wherein Petitioner used profanity, referenced his own mental health issues, and made statements that implied membership in a gang.

This claim was also presented on direct appeal to the Fifth DCA where it was rejected in a reasoned opinion. It was also presented by petition for review to the California Supreme Court and summarily denied. Accordingly, this Court must look to the decision of the appellate court. Ylst, 501 U.S. at 804-05. In rejecting the claim, the Fifth DCA stated:

> Arreola argues that prejudicial error arose from the trial court's admission of inflammatory, irrelevant, and only partially redacted recordings and transcripts of Arreola's jailhouse telephone conversations with his mother and with the mother of his children. The Attorney General argues that Arreola forfeited his right to appellate review by failing to object and that the trial court correctly admitted the challenged evidence.
>
> Preliminarily, as a general rule an appellate court can reach a question a party has not preserved for review only if the issue involves neither the admission nor the exclusion of evidence. (*People v. Williams* (1998) 17 Cal.4th 148, 161-162, fn. 6, 69 Cal.Rptr.2d 917, 948 P.2d 429, citing Evid.Code, §§ 353, 354.) Here, of course, the issue Arreola raises involves the admission of evidence. Our review of the record satisfies us that he adequately objected overall-with specific objections at times and with generic objections at other times-to preserve his right to appellate review. So we turn to the merits of his argument. Since the parties agree that portions of the partially redacted recordings and transcripts at issue were admissible to show bias, we will address only the portions about

which the parties disagree. As do the parties, we will address each of those categories separately.

The first category is profanity. With commendable candor, Arreola acknowledges that some of his profanity was "arguably relevant" by giving context to some of the points in the conversation. The profanity at issue is his "gratuitous use of profane remarks that have no relevance" and that serve, he argues, only to show that he was "a vulgar, base and vile person." Answering an analogous question, one Supreme Court case held that the "constant use of obscenities" in defendant's "profanity-laden" remarks in otherwise relevant recordings of his jailhouse telephone conversations did not so offend the jury as to make the trial court's admission of those recordings an abuse of discretion. (*People v. Hines* (1997) 15 Cal.4th 997, 1044-1045, 64 Cal.Rptr.2d 594, 938 P.2d 388.) Similarly, another Supreme Court case held that "numerous instances of offensive language" in defendant's jailhouse conversations did not make the trial court's admission of that evidence an abuse of discretion: "Jurors today are not likely to be shocked by offensive language and any risk of prejudice here was outweighed, as the trial court determined, by the probative value of the evidence." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1009, 254 Cal.Rptr. 586, 766 P.2d 1, disapproved on another ground by *People v. Loyd* (2002) 27 Cal.4th 997, 1008, fn. 12, 119 Cal.Rptr.2d 360, 45 P.3d 296.) Arreola's challenge falls squarely within the scope of both of those holdings.

The second category is mental health. Arreola told his mother that someone cast a spell on him that a "witch doctor" took away and told Martinez that a mental health professional transferred him to "the regular room" from the "the rubber room" where "the looney people" were. Statements like those, he argues, created "a substantial likelihood the jury would have concluded [he] had serious mental health issues" from which "the jury was all the more likely to conclude [he] was guilty as charged." Those are sequential sweeping inferences that we decline to indulge. Simpler plausible inferences are that he told his mother the metaphor about the spell to elicit sympathy for her wayward son and that he told Martinez about "the rubber room" to elicit sympathy for his plight as a prisoner.

Inferences aside, the prejudice to which Evidence Code section 352 refers is to "evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues." (*People v. Scheid* (1997) 16 Cal.4th 1, 19, 65 Cal.Rptr.2d 348, 939 P.2d 748.) Due to the trial court's "broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time," the exercise of that discretion "'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124, 36 Cal.Rptr.2d 235, 885 P.2d 1 (*Rodrigues* ).) Arreola fails to persuade us that the evidence at issue, which is only a small part of the partially redacted recordings and transcripts the parties generally agree were admissible to show bias, uniquely tended to evoke an emotional bias against him or constituted an arbitrary, capricious or patently absurd exercise of the trial court's discretion.

The third category is character for violence. Arreola characterizes as prejudicial evidence of his propensity for violence his statement to Martinez that he was "gonna beat [Modesto] up" for keeping longer than she should have the hair straightener she borrowed from Martinez. Yet he did not object to Modesto's later trial testimony that he disrespected and threatened her, which angered and offended her, and that she wanted payback. "By declining to object, a defense attorney might believe the additional information is favorable to his or her client." (*People v. Roldan* (2005) 35 Cal.4th 646, 730, 27 Cal.Rptr.3d 360, 110 P.3d 289, disapproved on another ground by *People v.*

*Doolin* (2009) 45 Cal.4th 390, ----, 87 Cal.Rptr.3d 209, 198 P.3d 11, fn. 22 [2009 LEXIS 2, *49, fn. 22; 2009 WL 18142, *17, fn. 22].) The lack of an objection might have been part and parcel of a trial strategy to characterize Modesto as a vindictive person willing to lie to get back at him for disrespecting her. "There being the possibility counsel made a considered decision not to object, we should not now give defendant a second bite at the apple." (*Ibid.*) Even if we were to overlook the lack of an objection, the evidence in the partially redacted recordings and transcripts is entirely cumulative to the evidence in Modesto's later trial testimony, so his complaint is meritless.

Arreola's only other challenge to evidence of character for violence is to his reply, after Martinez told him to "stay cool" in jail and not to "fight in there," that he had *not* "been fighting. I can't fight. They, they have me, they have me in a one man cell." He argues that his statement "effectively confirm [s] that he had both a propensity to fight and that he would have done so if given the opportunity." His statement shows nothing of the kind.

The fourth category is gang evidence. The sole statement in that category is Arreola's comment to Martinez that jail staff "can't put me in general population because I'm from Fresno County they automatically put me with the bulldogs." He told her that he was from Fresno County, not that he was a criminal street gang member from Fresno County. He told her that jail staff automatically put him with the Bulldogs, not that jail staff classified him as a member of the Bulldogs. He cites to nothing in the record showing anyone's use of his statement to show he was a member of the Bulldogs, to show Gonzales was a member of a rival criminal street gang, or to connect Gonzales's killing with gangs in any other way.

Nonetheless, Arreola argues that the "only reasonable explanation" for his statement is that he was affiliated with the Bulldogs criminal street gang or that jail staff thought he was. An equally reasonable explanation is that Kings County jail personnel automatically put all out-of-county inmates into cells by themselves as a routine precaution that has nothing to do with an out-of-county inmate's gang affiliation, if any. In short, his argument about the admission of a single ambiguous statement falls far short of "a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (See *Rodrigues, supra,* 8 Cal.4th at p. 1124, 36 Cal.Rptr.2d 235, 885 P.2d 1.)

The fifth category is hearsay. The sole statement in that category is Arreola's mother's comment that Lara asked Modesto, "How could you do that to your nephew?" and told her, "You know what? I don't want you at home at my house." Later, Lara testified, with no defense objection, that Modesto was living at Lara's house and babysitting Lara's daughter on the night of the killing, so she could not have heard Arreola say anything that night about the killing of "Ashley's baby daddy." Arreola's mother's comment is basically cumulative to Lara's later trial testimony, since both showed Lara's sympathy for Arreola, so the requisite showing of an exercise of discretion "in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice" is absent. (See *Rodrigues, supra,* 8 Cal.4th at p. 1124, 36 Cal.Rptr.2d 235, 885 P.2d 1.)

Generally, violations of state evidentiary rules do not rise to the level of federal constitutional error. (*People v. Benavides* (2005) 35 Cal.4th 69, 91, 24 Cal.Rptr.3d 507, 105 P.3d 1099, citing *Estelle v. McGuire* (1991) 502 U.S. 62, 70, 112 S.Ct. 475, 116 L.Ed.2d 385.) Since the premise implicit in Arreola's constitutional arguments is that the trial court's ruling so violated state evidentiary rules as to constitute an abuse of discretion, and since the record answers in the negative the question whether the trial court committed an error rendering his trial so fundamentally lacking in fairness as to

13

> violate his federal constitutional rights, we reject his latter arguments as well. (See *People v. Sanders* (1995) 11 Cal.4th 475, 510, fn. 3, 46 Cal.Rptr.2d 751, 905 P.2d 420; *Jammal v. Van de Kamp* (9th Cir.1991) 926 F.2d 918, 919-920.)

(See Petition, Ex. A.)

As previously discussed, the admissibility of evidence is generally an issue of state law which does not warrant habeas relief. Estelle, 502 U.S. at 67. "The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point." Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9thCir.1991). "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir.1995), *citing* Estelle, 502 U.S. at 67-68.

As noted by Respondent, there is no Supreme Court precedent governing the admission of evidence as a violation of due process. In Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.2009), the Ninth Circuit stated:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, *see Williams,* 529 US. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." *Musladin,* 549 U.S. at 77, 127 S.Ct. 649. Under the strict standards of AEDPA, we are therefore without power to issue the writ . . . .

Given that there is no governing Supreme Court precedent, Petitioner cannot demonstrate that the state court denial of his claim was contrary to or involved an unreasonable application of Supreme Court precedent. The claim must be rejected.

Even assuming a constitutional violation occurred, Petitioner has failed to demonstrate that the admission of the evidence had a substantial and injurious effect on the verdict. Brecht, 507 U.S. at 637. First, Petitioner concedes that some of the profanity was admissible as relevant. Second, as discussed by the state court, Petitioner's arguments concerning the mental health issue, tendency to fight, and gang membership were completely groundless. Third, the evidence of Petitioner's guilt was overwhelming. The admission of the taped conversations did not rise to the level of a constitutional violation, nor did the unredacted versions have a substantial and

injurious effect on the verdict. Further, Petitioner fails to demonstrate that the rejection of the claim by the state court was contrary to or an unreasonable application of Supreme Court precedent. The claim must be denied.

### C.  Failure to Instruct

In his third claim, Petitioner alleges the trial court violated his constitutional rights by failing to instruct on the lesser-included offense of voluntary manslaughter. He argues the instruction was warranted based on his defense of unreasonable self-defense.

Like the first two claims, this claim was raised on direct appeal and rejected by the Fifth DCA in a reasoned opinion. It was then raised to the California Supreme Court where it was rejected without comment. The Court looks through to the decision of the lower court for review of the claim. The appellate court denied the claim as follows:

> Arreola argues that prejudicial error arose from the trial court's failure to give a sua sponte instruction on the lesser included offense of voluntary manslaughter on a theory of imperfect self-defense. The Attorney General argues the contrary.
>
> Even though the trial court instructed the jury on the lesser included offense of voluntary manslaughter on a theory of provocation and sudden quarrel or heat of passion (CALCRIM Nos. 522, 570), Arreola argues that substantial evidence of imperfect self-defense required sua sponte instruction on the lesser included offense of voluntary manslaughter on a theory of imperfect self-defense (CALCRIM No. 571). He argues that "the jury certainly could have" inferred that Gonzales rushed him "with something that could be used as a weapon" due to "the proximity of such items and Gonzales being under the influence of methamphetamine."
>
> Citing *People v. Rogers* (2006) 39 Cal.4th 826, 48 Cal.Rptr.3d 1, 141 P.3d 135, the Attorney General counters that the doctrine of imperfect self-defense is narrow and that a trial court's duty to so instruct arises only when the defendant has an actual belief in the need for self-defense and only when the defendant fears imminent harm that must be instantly dealt with. (*Id.* at p. 883, 48 Cal.Rptr.3d 1, 141 P.3d 135.) Here, he argues, insufficient evidence of imperfect self-defense is in the record to impose a duty on the trial court to so instruct.
>
> The trial court has a duty to instruct sua sponte on imperfect self-defense only if the evidence or reasonable inferences from the evidence show the defendant actually believed that he "was in *imminent danger of being killed or suffering great bodily injury* " and that " *the immediate use of deadly force* was necessary to defend against the danger" but that at least "one of those beliefs was unreasonable." (CALCRIM No. 571, italics added.) Neither the testimony of Espinoza's sister nor any other evidence imposed that duty on the trial court. With admissions by both Arreola and Espinoza that Gonzales was killed for talking to the police, the record shows a classic revenge killing with "no evidence from which a jury could reasonably conclude defendant held an actual or honest belief in the need to defend against imminent danger." (*People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1270, 62 Cal.Rptr.2d 345 .)

(See Petition, Ex. A.)

The United States Supreme Court has held that the failure to instruct on a lesser included offense in a capital case is constitutional error if there was evidence to support the instruction. Beck v. Alabama, 447 U.S. 625, 638 (1980). In a noncapital case, the failure of a trial court to instruct sua sponte on lesser included offenses does not present a federal constitutional question. Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998); Turner v. Marshall, 63 F.3d 807, 813 (9th Cir.1995), *overruled on other grounds* by Tolbert v Page, 182 F.3d 677 (9th Cir.1999) (*en banc*) (finding the application of Beck to noncapital cases barred by Teague v. Lane, 498 U.S. 288, 299-300, 109 S.Ct. 1060, 1069 (1989)); James v. Reese, 546 F.2d 325, 327 (9th Cir.1976) (*per curiam*). However, a defendant may suffer a due process violation if the court's failure to give a requested instruction prevents a defendant from presenting his theory of the case. Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984), *cert. denied*, 469 U.S. 838 (1984); see, also, United States v. Mason, 902 F.2d 1434, 438 (9th Cir.1990) ("A defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence.").

No constitutional error occurred in this case. There was simply no evidence that Petitioner exercised deadly force out of fear of imminent danger of being killed or harmed. Rather, the facts were abundantly clear in showing Petitioner, in a premeditated and calculated manner, killed the victim for talking to the police. The claim must be rejected.

D. Failure to Provide Additional Instruction

In his final claim, Petitioner argues the trial court violated his due process rights by rejecting the proposed defense instruction "clarifying the law in relation to motive." (See Petition at 28.) As with the previous claims, this claim was presented on direct appeal and rejected by the Fifth DCA in a reasoned opinion, as follows:

> Arreola argues that prejudicial error arose from the trial court's denial of a defense pinpoint instruction on the law of motive. The Attorney General argues the contrary.
>
> The trial court instructed the jury on motive with CALCRIM No. 370:
>
> "The People are not required to prove that the defendant had a motive to commit the crime charged. In reaching your verdict you may, however, consider whether

the defendant had a motive.

"Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

The trial court refused, however, to add the following language in the standard instruction on motive:

"However, having a motive to kill by itself is not sufficient to find the defendant guilty of the charge. The People must prove each element of the charge beyond a reasonable doubt in order to find the defendant guilty of the crime."

In appropriate circumstances, a trial court has a duty to grant a request for a pinpoint instruction on a defense theory of the case that, among other things, relates the reasonable doubt standard of proof to particular elements of the crime charged, but a trial court need not give a pinpoint instruction that is argumentative, merely duplicates other instructions, or is not supported by substantial evidence. (*People v. Bolden* (2002) 29 Cal.4th 515, 558, 127 Cal.Rptr.2d 802, 58 P.3d 931.) "An instruction that does no more than affirm that the prosecution must prove a particular element of a charged offense beyond a reasonable doubt merely duplicates the standard instructions defining the charged offense and explaining the prosecution's burden to prove guilt beyond a reasonable doubt." (*Id.* at pp. 558-559, 127 Cal.Rptr.2d 802, 58 P.3d 931.) So a trial court "is required to give a requested instruction relating the reasonable doubt standard of proof to a particular element of the crime charged only when the point of the instruction would not be readily apparent to the jury from the remaining instructions." (*Id.* at p. 559, 127 Cal.Rptr.2d 802, 58 P.3d 931.)

Our Supreme Court has rejected repeated challenges to CALJIC No. 2.51,[FN6] the predecessor motive instruction to CALCRIM No. 370. In *People v. Wilson* (2008) 43 Cal.4th 1, 73 Cal.Rptr.3d 620, 178 P.3d 1113, the court found the instruction compliant with federal and state constitutional burden of proof and reasonable doubt requirements. (*Id.* at pp. 21-22, 73 Cal.Rptr.3d 620, 178 P.3d 1113, citing, e.g., *People v. Cleveland* (2004) 32 Cal.4th 704, 750, 11 Cal.Rptr.3d 236, 86 P.3d 302.) In *People v. Snow* (2003) 30 Cal.4th 43, 132 Cal.Rptr.2d 271, 65 P.3d 749, the court held that the instruction did not suggest that motive alone was sufficient to establish guilt but instead informed the jury that motive was not an element of murder and need not be shown, which left "little conceptual room for the idea that motive could establish *all* the elements of murder." (*Id.* at pp. 97-98, 132 Cal.Rptr.2d 271, 65 P.3d 749.) Congruently, we have rejected numerous challenges specifically to CALCRIM No. 370. (*People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1192-1193, 67 Cal.Rptr.3d 871.)

FN6. CALJIC No. 2.51: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish the defendant is guilty. Absence of motive may tend to show the defendant is not guilty."

The standard instruction on motive adequately and accurately states the law. The additional language requested merely duplicated the language in the standard instruction. The trial court correctly instructed the jury on the burden of proof, on proof beyond a reasonable doubt, on intent, and on the elements of murder. (CALCRIM Nos. 220, 225, 500, 520, 521, 522, 570.) On the law and the record, the trial court's denial of the defense pinpoint instruction on the law of motive was not error.

As a preliminary matter, the court notes that an allegation that a jury instruction is

incorrect under state law does not form a basis for federal habeas corpus relief. Estelle, 502 U.S. at 67 ("We have stated many times that federal habeas corpus relief does not lie for errors of state law."). Rather, a habeas court must consider "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process' ... not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" Henderson v. Kibbe, 431 U.S. 145, 154 (1977), *quoting* Cupp v. Naughten, 414 U.S. 141, 146-47 (1973); California v. Roy, 519 U.S. 2, 5 (1996) (challenge in habeas to the trial court's jury instructions is reviewed under the standard in Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) - whether the error had a substantial and injurious effect or influence in determining the jury's verdict.). The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Id. Moreover, the Court notes that Petitioner's burden is "especially heavy" with this claim, because an alleged "omission or an incomplete instruction is less likely to be prejudicial than a misstatement of law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

In this case, Petitioner fails to demonstrate any error of state law, let alone an error rising to the level of a constitutional violation. As noted by the state appellate court, the jury was completely instructed on intent, motive, the burden of proof, and all elements of the offense. The proposed additional instruction was unnecessary. Petitioner fails to demonstrate that the rejection of this claim was contrary to, or an unreasonable application of, Supreme Court precedent. It must be denied.

IV.     Certificate of Appealability

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

    (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

    (c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–

        (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

        (B) the final order in a proceeding under section 2255.

    (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

    (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

///

///

///

///

///

**ORDER**

Accordingly, IT IS HEREBY ORDERED:

1) The petition for writ of habeas corpus is DENIED WITH PREJUDICE;

2) The Clerk of Court is DIRECTED to enter judgment in favor of Respondent; and

3) The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

    **Dated:   May 6, 2011**　　　　　　　　　　　　/s/ **Gary S. Austin**
                                                          UNITED STATES MAGISTRATE JUDGE